UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CORIELLE DEMONT JOHNSON,

        Petitioner,

                                              Case Number 08-14258
v.                                          Honorable David M. Lawson

THOMAS BIRKETT,

        Respondent.
_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND PETITIONER'S MOTION FOR SUMMARY JUDGMENT

Petitioner Corielle Johnson, presently confined at Baraga Maximum Correctional Facility in Baraga, Michigan, has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, followed by a motion for summary judgment. He was convicted of first-degree murder, Mich. Comp. Laws § 750.316(1)(a), theft of a firearm, Mich. Comp. Laws § 750.357b, felon in possession of a firearm, Mich. Comp. Laws § 750.224f, and three counts of possessing a firearm during the commission or attempt to commit a felony (felony firearm), Mich. Comp. Laws § 750.227b. He was sentenced to concurrent prison terms of life for murder and three to ten years in prison for the larceny and felon-in-possession convictions, and consecutive two-year terms for the felony firearm convictions. The petitioner alleges that he is incarcerated in violation of his constitutional rights to due process of law and effective assistance of trial counsel. The respondent urges the Court to deny the petition on grounds that the habeas claims are not cognizable on habeas review and lack merit. The Court agrees that the petitioner is not entitled to relief. Therefore, the petition and motion for summary judgment will be denied.

I.

The petitioner was charged in Saginaw County, Michigan with open murder, larceny of a pistol, felon in possession of a firearm, and three counts of felony firearm. The charges arose from the fatal shooting of Devon Stinson in Saginaw, Michigan early on December 26, 2004. The prosecution maintained that the petitioner stole a gun from his girlfriend and then shot Stinson, believing that he was the person with whom he had an altercation earlier that night.

The trial began on October 4, 2005. Tamara Darby, the petitioner's girlfriend at the time of the shooting, testified that she had a relationship with the petitioner in December of 2004. At the time, she owned a six-shot, .357 caliber Ruger revolver, which she kept in a lockbox under her bed. The petitioner was aware of the gun and the fact that she occasionally got the gun out at night and put it back in the lockbox in the morning.

At approximately 11:00 p.m. on December 25, 2004, the petitioner left Darby's home to go to a club in Saginaw. About on hour later, Darby received a telephone call from the petitioner who said that he needed to use her bathroom. She let him in the house, and he stayed there about three or four minutes. She did not know whether he went into any room besides her bathroom because she was not watching him. When she asked him why he had left the club before closing hours, the petitioner stated that a fight involving the "Project Boys" had occurred at the club.

The petitioner left Ms. Darby's house and called her a second time about 1:00 a.m. on December 26, 2004. This time, he said that he needed a charger or battery for his cell phone. She had seen those items in her bedroom earlier that day, and after she let him into the house, the petitioner went to her bedroom for two or three minutes. He left the house but returned about twenty

minutes later and went to her bedroom where his young daughter was sleeping. Darby retrieved her gun from the bedroom and placed it under the couch where she was seated in the living room.

The petitioner later told Ms. Darby about a rumor that he had called someone and informed the person that his friend would be dead in ten minutes. Within ten minutes a man was found dead. Ms. Darby eventually read about a murder that occurred between 2:30 a.m and 3:00 a.m. on December 26, 2004. She did not believe that the petitioner was involved in the murder because he was back at her home by then. The rumors, however, caused her to become concerned about her and her children's safety. She eventually informed the petitioner that he would have to leave her home. He left her place on January 5 or 6, 2005.

Sometime between January 4 through 7, 2005, Ms. Darby discovered that her gun was missing. She confronted the petitioner with that information because no one else had been in her house. He denied taking her gun, and he denied killing the young man on Dillon Street. He ultimately did admit firing a shot, and she assumed that he had used her gun.

The petitioner's acquaintance, Lyndon Sampson, also testified for the prosecution. The prosecutor established through Sampson's trial testimony, statement to the police, and preliminary examination testimony that about a week after the shooting, the petitioner mentioned to Sampson that he had shot Mr. Stinson by mistake, thinking that he was someone else.

Parole agent Gary Lutkus testified that at the time of the murder, the petitioner was on parole for two drug crimes. Detective Sergeant Ryan Larrison of the Michigan State Police testified that two spent metal jackets found in the vehicle where Mr. Stinson had been shot were fired from the same gun, which could have been a .38 or .357 caliber. He was not given a firearm to test, but he explained that a .357 caliber gun is almost always a revolver. Detective Robert Ruth testified that

he investigated rumors about other people being responsible for the crime, but the only information that he was able to corroborate was evidence concerning the petitioner's involvement in the crime.

The petitioner did not testify or present any witnesses. His defense was that the prosecution failed to show he was the actual shooter. The jury found the petitioner guilty of first-degree premeditated murder, larceny of a firearm, felon-in-possession of a firearm, and three counts of felony firearm. The trial court imposed the sentences noted above.

The petitioner moved for a new trial on the ground that his trial attorney was ineffective. The trial court held an evidentiary hearing pursuant to *People v. Ginther*, 390 Mich. 436, 443-44, 212 N.W.2d 922, 925 (1973) (holding that "[a] defendant who wishes to advance claims that depend on matters not of record can properly be required to seek at the trial court level an evidentiary hearing for the purpose of establishing his claims with evidence as a precondition to invoking the processes of the appellate courts"). The trial court denied the petitioner's motion for new trial, stating that the petitioner's claims of ineffective assistance of counsel were without merit and that the petitioner was not deprived of a trial whose result was fair and reliable.

The petitioner raised his habeas claims in the Michigan Court of Appeals, which affirmed his convictions in an unpublished *per curiam* decision. *See People v. Johnson*, No. 267822, 2007 WL 4548288 (Mich. Ct. App. Dec. 27, 2007). On April 28, 2008, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues. *See People v. Johnson*, 480 Mich. 1191, 747 N.W.2d 306 (2008) (table).

The petitioner filed his habeas corpus petition on October 6, 2008. The grounds for relief are:

    I.    Mr. Johnson is entitled to a new trial where defense counsel provided constitutionally ineffective assistance by: (1) failing to reveal the

>           source of [the petitioner]'s knowledge of the missing gun; (2) failing
>           to reveal evidence of an automatic weapon through proper cross-
>           examination of Antaurean Jones; (3) failing to exclude irrelevant
>           evidence of bad character.
>
>     II.   Admission of Tamara Darby's entire video-taped statement
>           represented improper impeachment and prejudicial evidence,
>           violating Mr. Johnson's constitutional rights to due process.
>
>     III.  Improper admission of Lyndon Sampson's tape-recorded statement
>           and preliminary exam violated the court rules and Mr. Johnson's
>           constitutional rights to due process.
>
>     IV.   Mr. Johnson's state and federal constitutional due process rights to
>           a fair trial were violated when the jury heard evidence of Lyndon
>           Sampson's successful polygraph exam.

The respondent asserts in an answer to the habeas petition that the petitioner's claims are not cognizable on habeas review and lack merit.

## II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering applications for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003). As amended, 28 U.S.C. § 2254(d) permits a federal court to issue the writ only if the state court decision on a federal issue "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or it amounted to "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) & (2); *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable."

*Wiggins*, 539 U.S. at 520-21 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (internal quotes omitted)). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (stating that "[t]he court gives complete deference to state court findings of historical fact unless they are clearly erroneous").

The Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams*, 529 U.S. at 405-06.

The Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . .
>
> [A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court

concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409-11; *see also Knowles v. Mirzayance*, __ U.S. __, __, 129 S. Ct. 1411, 1419 (2009) (noting that the Supreme "Court has held on numerous occasions that it is not "''an unreasonable application of clearly established Federal law''" for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (quoting *Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (per curiam)); *Murphy v. Ohio*, 551 F.3d 485, 493-94 (6th Cir. 2009); *Eady v. Morgan*, 515 F.3d 587, 594-95 (6th Cir. 2008); *Davis v. Coyle*, 475 F.3d 761, 766-67 (6th Cir. 2007); *King v. Bobby*, 433 F.3d 483, 489 (6th Cir. 2006); *Rockwell v. Yukins*, 341 F.3d 507, 512 (6th Cir. 2003) (en banc).

A.

The petitioner first asserts that his trial attorney provided constitutionally ineffective assistance, and therefore the petitioner's Sixth Amendment rights were violated. The Michigan Court of Appeals adjudicated this claim on the merits and concluded that the claim did not warrant relief.

The two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), governs the Court's analysis of ineffective-assistance-of-counsel claims. *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). To show a violation of the Sixth Amendment right to effective assistance of counsel, a petitioner must establish that his attorney's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-88. The defendant must show "that counsel made errors so serious that counsel was not functioning

as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689.

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. The defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "Unless a defendant makes both showings [i.e., deficient performance and resulting prejudice], it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id*. at 687.

1.

Tape recordings of two of the petitioner's jailhouse telephone conversations with Tamara Darby were played for the jury at trial. In one of those conversations, the petitioner informed Ms. Darby that the police did not have the murder weapon or any of his clothes with gunshot residue on them. The prosecutor speculated in his closing argument that the petitioner knew the police did not have his clothes or the murder weapon because he disposed of them in a place where the police would not find them.

The petitioner claims that his trial attorney should have introduced in evidence a taped telephone conversation that the petitioner had with his mother prior to his conversations with Ms. Darby. According to the petitioner, the taped conversation with his mother would have shown that it was his mother who informed him that the police did not have the gun used in the shooting. This evidence, the petitioner argues, would have demonstrated that he did not have information known only to the police and the shooter.

Defense counsel testified at the post-conviction evidentiary hearing in state court that he thought the taped conversation between the petitioner and his mother was inadmissible and self-serving. The Michigan Court of Appeals agreed that the evidence was inadmissible hearsay and concluded that defense counsel was not ineffective for failing to attempt to admit the evidence.

The petitioner argues that the evidence was not hearsay because it would not have been admitted for the truth of the matter (that is, whether the police actually recovered the gun), but to show the source of his knowledge. He is correct. *See United States v. Johnson*, 71 F.3d 539, 543 (6th Cir. 1995) (holding that out-of-court statement offered to demonstrate defendant's knowledge was not hearsay). However, even if defense counsel was remiss in not attempting to admit the taped statement between the petitioner and his mother, the circumstantial evidence against the petitioner was substantial. The evidence established that the petitioner shot the victim, thinking that he was someone he encountered earlier that night at the nightclub. Furthermore, to his credit, defense counsel pointed out in his closing argument that the petitioner's comments about the police not having his clothes or the gun could have been made by an innocent man explaining to his girlfriend that the police had no evidence connecting him to the crime.

Defense counsel's failure to introduce evidence concerning the source of the petitioner's knowledge of the missing gun did not prejudice the defense, given the substantial evidence against the petitioner. The petitioner therefore has failed to establish prejudice as required by *Strickland*.

2.

The petitioner next asserts that defense counsel's cross-examination of Antaurean Jones at the petitioner's preliminary examination was deficient. Jones was seated in a vehicle next to the

victim at the time of the shooting, and in a statement to the police, he said that he thought the gunshots had come from an automatic gun. Jones did not testify at trial. Detective Robert Ruth explained at trial that Jones was presently "on the run" and that every time the police needed him in court, they had to arrest him because he did not want to talk about people in court even though his friend was killed. Jones, therefore, was deemed unavailable; his testimony from the petitioner's preliminary examination was read into the record. Nowhere in his testimony does Jones state that an automatic gun fired the gunshots that killed his friend. The petitioner therefore claims that defense counsel should have asked Jones at the preliminary examination whether an automatic gun was used to kill the victim. According to the petitioner, evidence that an automatic gun was used in the shooting could have persuaded the jury that someone other than the petitioner shot the victim, because the prosecutor's theory was that the petitioner used Tamara Darby's revolver. The Michigan Court of Appeals stated that counsel's questioning of Jones was a matter of trial strategy and that the petitioner had not overcome the presumption of sound strategy.

As a general rule, trial counsel's strategic decisions on how the trial is to be conducted are afforded great deference. As the Supreme Court explained:

> It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Strickland*, 466 U.S. at 689 (internal quotation marks and citations omitted). "[A] lawyer's acts and omissions must be judged on the basis of what he knew, or should have known, at the time his tactical choices were made and implemented." *Ouber v. Guarino*, 293 F.3d 19, 25 (1st Cir. 2002) (citing *Bell v. Cone*, 535 U.S. 685 (2002)). It is equally true that "errors of tactics or omission do not necessarily mean that counsel has functioned in a constitutionally deficient manner." *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001).

This Court finds no merit in the petitioner's claim, because defense counsel could not have anticipated at the preliminary examination that Antaurean Jones would not testify at trial. In fact, the prosecutor named Jones as a possible witness at the beginning of the trial, and on the fifth day of trial, the prosecutor was still hoping to produce Jones.

Even if defense counsel had asked Jones about the gun he heard, there is no guarantee that Jones would have testified that he heard an automatic gun. Although Jones did tell the police that he knew the gun used in the shooting was an automatic and not a revolver, he stated at a different point in the interview that he did not know what kind of gun was used.

In addition, defense counsel testified at the post-conviction evidentiary hearing that he spoke with Jones and that Jones denied his statement to the police. Defense counsel stated that he made a strategic decision not to call Jones as a witness at trial because Jones did not see anything and would not have helped the defense. The state court's determination that defense counsel's failure to ask Antaurean Jones at the preliminary examination whether he thought the shooter used an automatic gun did not rise to the level of deficient performance is not contrary to or an unreasonable application of Supreme Court precedent.

Moreover, the allegedly deficient performance did not prejudice the defense. Detective Larrison testified that he could not say with specificity what type of gun fired the recovered bullet jackets and that a semiautomatic pistol could fire a .357 Magnum cartridge. The jury convicted the petitioner as charged despite evidence that a semiautomatic gun could have been used in the shooting. Defense counsel's performance therefore did not prejudice the petitioner.

3.

The petitioner's final claim about his trial attorney alleges that defense counsel failed to exclude irrelevant and prejudicial "bad acts" evidence. The disputed evidence consisted of the petitioner's comment to Tamara Darby that he had to go to court on a charge that he kicked a woman in the face. The evidence came to light when the petitioner's tape-recorded telephone conversation with Tamara Darby was played for the jury.

Defense counsel objected to the admission of the taped conversations between the petitioner and Ms. Darby. The petitioner nevertheless claims that, once the trial court ruled that the conversations were admissible, defense counsel should have moved to redact the portion of the tape that mentioned the assault charge. The Michigan Court of Appeals ruled that the petitioner was not prejudiced by his attorney's failure to object to the evidence.

The Court agrees with the petitioner that defense counsel should have sought redaction of the portion of the tape that mentioned the petitioner's assault on a woman. However, the petitioner's mention of the assault charge was a fleeting and minor part of a lengthy trial. No further mention was made of the assault, and the parties stipulated that the petitioner was a felon. The Court cannot say that with redaction, "the result of the proceeding would have been different." *Strickland*, 466

U.S. at 694. Therefore, defense counsel's failure to redact the tape to delete evidence of the petitioner's assault on a woman likely did not prejudice the defense.

In conclusion, there is not a reasonable probability that the result of the trial would have been different, but for defense counsel's alleged mistakes. The petitioner therefore has failed to show that he was denied the effective assistance of counsel in violation of the Sixth Amendment.

B.

The petitioner's remaining three claims allege that the admission of certain evidence at trial violated the Michigan Rules of Evidence and the petitioner's constitutional right to due process of law. "To the extent that any testimony and comments violated Michigan's rules of evidence, such errors are not cognizable on federal habeas review." *Hall v. Vasbinder*, 563 F.3d 222, 239 (6th Cir. 2009) (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006)). Generally, state-court evidentiary rulings do not rise to the level of due process violations unless they "'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996) (quoting *Patterson v. New York*, 432 U.S. 197, 201-02 (1977)); *see also Spencer v. Texas*, 385 U.S. 554, 563-64 (1967) (stating that "the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial"); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) (stating that, "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief"). The Supreme Court "ha[s] defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States*, 493 U.S. 342, 352 (1990).

1.

The petitioner claims that it was error to admit in evidence Tamara Darby's entire videotaped statement to the police because it was improper impeachment evidence. The petitioner contends that the statement contained prejudicial assumptions and conclusions about his guilt, motive, and capacity to commit more killings.

The prosecutor was permitted to play the videotaped statement because Ms. Darby testified at trial that the petitioner returned to her house on December 26, 2004, about 1:30 a.m. on the night of the shooting, but she informed the police earlier that the petitioner returned to her place at approximately 2:20 a.m. The shooting supposedly occurred about 2:00 a.m.

The jury was instructed that Ms. Darby's statement to the police was offered as impeachment evidence, and not as substantive evidence, but the prosecutor clearly was attempting to establish that the petitioner returned to Ms. Darby's house after the shooting. The Michigan Court of Appeals nevertheless stated that the trial court did not abuse its discretion in admitting the statement.

This Court finds that even if the evidence was admitted for an improper purpose under state law, the petitioner's constitutional rights to a fair trial and to due process of law were not violated. After Ms. Darby's taped statement to the police was played for the jury, the prosecutor re-called Ms. Darby. She then testified that she was unsure what time the petitioner had returned to her home on December 26, 2004, because she had not checked a clock. She was unable to say whether he returned at 1:30 a.m., as she testified on cross-examination at trial, or whether he returned about 2:30 a.m., as she told the police. She went on to say that what she told the police was not necessarily true. She "sugar-coated" her statement to the police because the officer had said she could be charged as an accessory to the crime, and she wanted to return home to her children. In light of this

testimony, the admission of Ms. Darby's statement to the police was not fundamentally unfair and did not deprive the petitioner of due process of law.

2.

The petitioner alleges next that Lyndon Sampson's tape-recorded statement to the police and testimony from the preliminary examination should not have been admitted in evidence. Sampson's statement to the police was not transcribed, but his testimony at the preliminary examination was made a part of the trial transcript. Sampson testified at the preliminary examination that he saw the petitioner at a parole office on January 5, 2005. During their conversation, the petitioner admitted to Sampson that he had shot Mr. Stinson. He claimed that it had been a mistake and that he did not know it was Stinson whom he shot. The petitioner also explained to Simpson that he had "gotten into it" with Shawnte Mathis at a nightclub earlier in the night and that everything had escalated from there. He wanted Sampson to let everyone know that he shot Mr. Stinson by mistake.

The Michigan Court of Appeals held that Sampson's statement to the police and his testimony from the preliminary examination were admissible under the Michigan Rules of Evidence. The petitioner's disagreement with the Michigan Court of Appeals on the admissibility of the statement under state law is not a basis for habeas relief because "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. at 67-68 (citing 28 U.S.C. § 2241; *Rose v. Hodges*, 423 U.S. 19, 21 (1975) (per curiam)); *accord Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *Pulley v. Harris*, 465

U.S. 37, 41 (1984) (explaining that a federal habeas court may not issue the writ on the basis of a perceived error of state law).

Although the petitioner alleges that the admission of Sampson's statement to the police and testimony at the preliminary examination also violated his right to due process, defense counsel did not object to the admission of the preliminary examination testimony. As for Sampson's statement to the police, Sampson repeatedly informed the trial court and the attorneys that he did not want to testify or could not recall details of his statement to the police.

Furthermore, Sampson testified at trial that his statement to the police and testimony at the preliminary examination were motivated by his desire to receive favorable treatment from the police on criminal charges that he incurred shortly after he spoke with the petitioner. Given Sampson's reluctance to testify at trial, his claimed lack of memory, and his alleged motivation for speaking to the police and testifying as he did at the preliminary examination, the use of his statement to the police and testimony from the preliminary examination was not so fundamentally unfair as to deprive the petitioner of due process.

3.

The petitioner's final claim alleges that his right to due process was violated when Lyndon Sampson mentioned a polygraph examination. Sampson's first reference to the polygraph examination occurred when defense counsel asked Sampson whether his testimony was the absolute truth or just something that he was expected to say. Sampson answered:

> Well, if – if you all got . . . the polygraph thing right, he was making me say specific things like . . . you ain't being more specific. He like just say, did he say it, and I never really told him that he told me that, you know. I just told him we had a conversation. He's like, well, did he tell you he killed him, and he made me say, yeah, and this that and that's how the polygraph thing came about. The guy was from Flint. That's all I remember about him.

Tr. Oct. 11, 2005, at 74.

Shortly afterwards, defense counsel asked Sampson whether the police had told him what to say at the preliminary examination. Sampson responded, "Yes, . . . the polygrapher [sic] guy. I don't know if he's an officer or not, but he was making me say and . . . just be more specific about things." *Id.* at 76. Defense counsel then moved for a mistrial in the jury's absence. The trial court denied the motion for mistrial, and the Michigan Court of Appeals held that the trial court did not abuse its discretion in so ruling.

Although the results of polygraph tests are not admissible at criminal trials in Michigan, *People v. Phillips*, 469 Mich. 390, 397, 666 N.W.2d 657, 661 (2003); *People v. Barbara*, 400 Mich. 352, 364, 255 N.W.2d 171, 175 (1977), "the Supreme Court has not held that admission of testimony relating to a truth test renders a trial fundamentally unfair . . . ." *Maldonado v. Wilson*, 416 F.3d 470, 476 (6th Cir. 2005). Furthermore, defense counsel conceded at trial that the references to a polygraph examination were "rather minimal." Tr. Oct. 11, 2005, at 80. Defense counsel also declined the trial court's offer to give a cautionary jury instruction.

The references to the polygraph examination were brief and isolated. Moreover, the results of the test were not mentioned. The Court believes that Sampson's references to a polygraph examination did not deprive the petitioner of a fair trial. The Michigan Court of Appeals' decision upholding the petitioner's conviction, despite the arguably improper reference to a polygraph examination, was not contrary to, or an unreasonable application of, federal law. *Maldonado*, 416 F.3d at 476.

III.

The Michigan Court of Appeals' rejection of the petitioner's claims did not result in a decision that was contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus [dkt. #1] is **DENIED**.

It is further **ORDERED** that the petitioner's motion for summary judgment [dkt. #22] is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: March 31, 2010

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 31, 2010.

s/Teresa Scott-Feijoo
TERESA SCOTT-FEIJOO